**EXHIBIT 6**

# BIERMAN & ASSOCIATES

17 BATTERY PLACE - SUITE 204
NEW YORK, NEW YORK 10004

TELEPHONE: (212) 363-6960

April 29, 2016

**BY HAND DELIVERY**
Mr. Kevin J. Berry
U.S. Equal Employment Opportunity Commission
New York District Office
33 Whitehall Street, 5th Floor
New York, NY 10004
Attn.: Ralph Charles

       Re: Adriana Agostini v. EmblemHealth, Inc.
        EEOC Charge No. 520-2015-02635

Dear Mr. Berry:

  Complainant Adriana Agostini ("Complainant") submits this rebuttal in response to the position statement submitted by EmblemHealth, Inc. dated April 4, 2016. As discussed more fully below and in Complainant's initial complaint, EmblemHealth has engaged in discriminatory and retaliatory treatment against Complainant and ultimately terminated her on the basis of her disability and/or as retaliation for making a complaint of discrimination. For the reasons set forth in the Complaint and for the reasons more fully discussed below, probable cause that EmblemHealth engaged in discriminatory and retaliatory acts should be found.

### A. EmblemHealth's Claim That It Was Unaware of Complainant's Disability is Untrue.

  EmblemHealth's claims that the managers in her department were never notified, prior to July 29, 2014 that she was suffering from a condition that made standing for excessive periods of time is simply untrue. Whether or not EmblemHealth's FMLA was administered by a third party, Complainant regularly contacted EmblemHealth directly, including her former managers Maria Vega, Jane Charles Magnum, Hedi Figueroa and Neco Bellin to speak with them about taking leave on a specific day. Indeed, she had regular conversations with each of these managers and other EmblemHealth employees every few weeks or so beginning in about 2013 when she would experience flareups and pain in her legs and joints.

  Complainant did not, as EmblemHealth claims, ever volunteer for assignments that would require her to stand for extensive periods of time or to do repetitive motions. Such activities were quite painful for her, because of her rheumatoid arthritis and were, therefore,

1

quite difficult for her. Such tasks were not regularly required of her, and, indeed, her job typically consisted of tasks that would not involve standing for more than fifteen to thirty minutes at a time.

### B. EmblemHealth Never Suggested That They Would Provide Any Accommodation to Complaint.

Even assuming, *arguendo*, that EmblemHealth was unaware of Complainant's disability as of July 29, 2014, it is undisputed that it was informed of it on that date. On that date, rather than engage in a discussion with Complainant as to what sort of accommodation could be provided to her, Complainant's manager, Alan Weishaupt, repeatedly insisted that it was Complainant's job to stand at the copier for hours at a time, despite the fact that it was not. Weishaupt was entirely unwilling to work with her to find an accommodation that would allow her to perform her actual job duties with her disability, insisting that she do the work that he knew would exacerbate the symptoms of her disabilities.

After being treated with such dismissiveness by Weishaupt, Complainant went to Human Resources of her own accord. Weishaupt did not, as EmblemHealth claims, suggest that she go to Human Resources to discuss any "options" she may have or in any way indicate that EmblemHealth would aid her in performing her actual job duties without exacerbating her condition. Rather, he made clear that he would not take reasonable steps to allow Complainant to work without aggravating her symptoms.

Moreover, contrary to EmblemHealth's claims, Complainant never stated or even suggested that standing at a copier for hours at a time was part of normal job duties. In fact, she explicitly stated that she felt that she had been targeted and singled out to perform a task that would exacerbate her condition that others in her position were not required to perform and which she had not been asked to do previously. At the meeting with Human Resources, it was specifically discussed that it was very difficult for Complainant to stand for extended periods of time and that it aggravated her rheumatoid arthritis and caused her legs to swell, causing tremendous pain. It was only then that Complainant was advised that she needed a reasonable accommodation form to be completed by her doctor to verify the disability from which she suffered before they would be willing to accommodate her.

EmblemHealth's claim that the July 30, 2014 reasonable accommodation form is deficient because it somehow did not sufficiently advise them of her disability and the accommodation sought is disingenuous. The very day before, Complainant advised not one but three EmblemHealth supervisors – one of her managers, Maria Vera; the director of her department, Alan Weishaupt; and Lisa Butler, EmblemHealth's Senior Human Resources Specialist – that the specific issue that she was facing was that standing for extended periods of time caused swelling and pain in her legs. The July 30, 2014 reasonable accommodation form confirmed from her doctor that Complainant, "experiences ongoing inflammation in arms, hands,

shoulders, feet," exactly what Complainant had stated to Weishaupt, Vera and Butler the day before.

Moreover, after she had submitted the first reasonable accommodation form, EmblemHealth did not engage in any discussion with Complainant regarding reasonable accommodations that it could provide to her, instead insisting that she provide another reasonable accommodation form from a different doctor. Complainant even asked if she could simply be provided a chair or not required to stand for extended periods of time, yet Human Resources did not even suggest that it would, instead simply telling her that the reasonable accommodation form she provided was deficient.

Additionally, EmblemHealth's claim that it was attempting to accommodate her after this meeting or at any time rings false. If EmblemHealth's claim that they "began to consider possible accommodations including obtaining a tall drafting chair to place by the copier" and that they "began the process" of selecting such a chair, not a single EmblemHealth employee ever communicated this to Complainant or even suggested that it was an option, despite knowing the stress and anxiety it was causing to Complainant. Moreover, about six weeks passed from the time of the July 29, 2014 incident to the time that Complainant's employment was wrongfully terminated, yet the chair that EmblemHealth was supposedly in "the process" of obtaining was, by EmblemHealth's own admission, never obtained. Moreover, notably absent from the documentation provided by EmblemHealth is any receipt or other documentation indicating that such an item was ever purchased.

Even assuming, *arguendo*, that the first reasonable accommodation form had somehow been deficient, which it was not, Complainant provided a second reasonable accommodation form from a different doctor, again specifically notifying EmblemHealth of Complainant's condition. It specifically asked that Complainant not be required to stand for more than fifteen to thirty minutes at a time and requested that she be provided with a chair in such cases. EmblemHealth, Exh. E. Even after the second reasonable accommodation form was submitted by Complainant, no one from EmblemHealth engaged in a discussion with Complainant about what kind of accommodation she could be given to allow her to perform work without aggravating her disability or in any way advised her that they were trying to obtain a chair for her. Instead, they inexplicably told Complainant that she needed to obtain yet another form requesting an accommodation, despite the fact that it was the exact form that she was told to use and despite that fact that it bore the EmblemHealth logo and was labeled "Reasonable Accommodation Request Form." Instead, EmblemHealth mendaciously suggested that the form was somehow fraudulent and had been completed by Complainant rather than her doctor, even though it was clearly stamped by her doctor's office.

Complainant thereafter submitted a third request in the form of a doctor's note, as she was explicitly told to submit a few days later on or about August 14, 2014. *See* Compl., Exh. A. EmblemHealth does not dispute this. Still, despite the fact that this third request was submitted

and one month passed between the time of this third note and her wrongful removal from her position, no one from EmblemHealth ever discussed with Complainant or indicated to her in any way that it would provide her with any kind of accommodation.

### C. EmblemHealth's Claim that Complainant Did Not Engage in Protected Activity is False.

Additionally, EmblemHealth's claim that it did not retaliate against her because she never complained of discrimination is, likewise, stridently false. Aside from the complaints she made on July 29, 2014, in which she specifically stated that she felt that she was being targeted due to her medical condition and discriminated against, she thereafter filed a formal complaint with the Human Resources against Weishaupt on or about August 1, 2014. This certainly constitutes a protected activity. As discussed more fully in Complainant's initial complaint, she was told by the Human Resources department that the incident would be investigated.

Despite the fact that that complaint was made weeks before the wrongful termination of her employment, EmblemHealth declined to discuss it further with her, specifically notifying Complainant that an investigation would be conducted once the layoffs were completed, then wrongfully ending her employment before the investigation was completed. Complainant did not bring this up at each and every meeting about the multiple needless reasonable accommodation requests that she was required to file because she was told that it was being investigated and that she would have to wait a few weeks before she could meet with a human resources representative and her union representative and reasonably believed that this was the case. In any event, Complainant was not required to bring up the complaint she filed each and every time she went to Human Resources.

### D. The Termination of Complainant's Employment Violated the CBA and Was Done for Discriminatory Reasons and EmblemHealth's Justification is Pretextual.

Additionally, EmblemHealth's attempts to justify Complainant's layoffs under the CBA are meritless. First, Complainant did not have a mere six years of seniority based on the time that she was officially an EmblemHealth employee in the position of Imaging Clerk, as EmblemHealth's response seems to suggest. Rather, she had almost sixteen years for the purposes of seniority, from the time she began working for HIP Health Plan of New York in about October 1998. Indeed, Article XII of the CBA specifically states that "[s]eniority shall include continuous service with…HIP." Moreover, EmblemHealth's claim that seniority was determined by the amount of time spent in a particular position is plainly contrary to the CBA, which states, in Article XII, "Seniority shall be defined as length of service with the employer." EmblemHealth Exh. B.

Additionally, Imaging Clerks at EmblemHealth all performed the same job duties and had the same job description as one another, so their claim that Complainant's "layoff" was justified because she had the least seniority of the sorter imaging clerks is baseless. Indeed, the

CBA treats "Imaging Clerk" as one job, not divided up by job function of sorter, scanner or transfer clerk, as EmblemHealth claims. Even assuming, *arguendo*, that "imaging clerk-sorter" was a separate position for "imaging clerk-scanner" or "imaging clerk-transfer clerk," as EmblemHealth argues, Complainant should have been permitted to bump into either the "imaging clerk-scanner" or "imaging clerk-transfer clerk" positions. EmblemHealth does not refute that there were other employees in the "imaging clerk" position who had less seniority than Complainant. Imaging clerks are all "Grade D" positions (Compl. Exh. B), and, as indicated in the CBA and acknowledged by EmblemHealth, if Complainant were bumped from her position, she was permitted to bump into another "Grade D" position for which she was qualified. *See* EmblemHealth Exh. B, Art. XI. Since all imaging clerks regularly performed the same duties, Complainant was certainly qualified for these positions, yet was not permitted to bump into one of them.

Moreover, EmblemHealth admits that there were a number of other positions in the "Grade C" and "Grade D" that she was permitted to bump into. EmblemHealth claims that Complainant could not bump into these positions in part because she had not held such positions before. This is plainly contrary to the CBA, which states that she would "have the right to bump another employee in the same or a lower classification with less company-wide seniority, provided such employee accepts such job within two (2) work days, and has satisfactorily performed in the past the duties of the new assignment, **or has the qualification for and can satisfactorily perform such duties**." (emphasis added). *See* EmblemHealth, Exh. B, Art. XI, Sec. 2. Indeed, the employee who bumped Complainant from her position had never previously held such position. Moreover, EmblemHealth does not indicate, in any way, how Complainant was "unqualified" for any of the positions or even which positions she was unqualified for. Indeed, she was clearly qualified for other imaging clerk positions and had indisputably performed the duties of those positions satisfactorily.

Furthermore, EmblemHealth's description of the meeting in which Complainant was supposedly laid off is inaccurate. At no point was Complainant offered to bump into a housekeeping position. In actuality, Complainant was told that the only position into which she would be permitted to bump would be housekeeping but that she would not be permitted to do so because she, by EmblemHealth's claim, not her own, could not perform the duties of that position due to her disability. Complainant did not and would not turn down an offer to be bumped into the housekeeping position, as she had, indeed, performed that job satisfactorily in the past.

Contrary to EmblemHealth's claims, Complainant made multiple efforts following her removal from her position to seek assistance from both EmblemHealth and her union. On September 11, 2014, the day of her removal from her position, she sent an email to Valerie Reardon and Frank Branchini, the President of EmblemHealth explaining that she felt that she had been discriminated against on the basis of her disability in relationship to the layoff and that her layoff was in violation of the CBA. On September 19, 2014, she called and left a message for

5

Myra Hepburn, the business representative for her union, then sent follow-up emails to her on September 23, 2014 and October 24, 2014. None of these individuals responded to Complainant.

## CONCLUSION

As described above and in Complainant's initial Complaint, EmblemHealth discriminated against Complainant on the basis of her disability, refused to provide her with a very simple accommodation or to even engage in a dialogue with her about possible accommodations, then unlawfully terminated her employment and in retaliation for her complaints and for discriminatory reasons. Accordingly, probable cause should be found that EmblemHealth acted in a discriminatory and retaliatory manner against Complainant.

Sincerely,

Allison Smith, Esq.
Bierman & Associates
Attorneys for Complainant
17 Battery Place, Suite 204
New York, NY 10004

Encl.

6

P000245