UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ADRIANA AGOSTINI,

                   Plaintiff,

          - v -

EMBLEMHEALTH, INC., and ALAN WEISHAUPT,
JONATHAN FRANDSEN and DANIEL BYRNE,
Individually and as Employers,

                   Defendants.

 :  **VIA ECF**
 :
 :  Case No. 16-cv-7119 (DC)
 :
 :  **DECLARATION OF DANIEL**
 :  **BYRNE IN SUPPORT OF**
 :  **DEFENDANTS' MOTION**
 :  **FOR SUMMARY JUDGMENT**
 :
 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Daniel Byrne, pursuant to 28 U.S.C. § 1746, declares:

1.     I am currently employed by defendant EmblemHealth, Inc. ("EmblemHealth" or the "Company") as the Vice President of Labor Relations.  I have worked in this role, and prior roles within EmblemHealth's Labor Relations Department; as well as its predecessor, Group Health Incorporated ("GHI") since 2002.

2.     I submit this declaration in support of the defendants EmblemHealth, Alan Weishaupt ("Weishaupt"), Jonathan Frandsen ("Frandsen"), Daniel Byrne's motion for summary judgment to dismiss the Complaint of Adriana Agostini ("Agostini") pursuant to Federal Rule of Civil Procedure Rule 56.  This declaration is based upon my personal knowledge, as well as my review of various Human Resources and other Company documents.

3.     In 2014, one of my responsibilities as Vice President of Labor Relations was to administer and oversee a variety of human resources and employment matters relating to EmblemHealth employees who were members of the Office and Professional Employees International Union, Local 153 (the "Union").

**EmblemHealth Policies Strictly Prohibit Discrimination,**
**Harassment, and Retaliation and Provide Complaint Procedures**

4.      EmblemHealth is a health insurance company that provides affordable health insurance coverage to members in the New York metropolitan area. EmblemHealth was formed through the affiliation of Health Insurance Plan Company of New York ("HIP") and Group Health Incorporated ("GHI") in 2006.  On January 1, 2008, the HIP and GHI employees formally became employed by EmblemHealth.

5.      At all times relevant to the issues relevant in this litigation, EmblemHealth maintained: (1) a zero tolerance policy against discrimination, harassment and retaliation in the workplace; (2) strict policies and procedures relating to equal employment opportunities, non-discrimination, and non-harassment; (3) complaint procedures for employees to report incidents where the employee believed that he or she had been subjected to (or witnessed) any form of discrimination and/or harassment; and (4) strict policies prohibiting retaliation against anyone for reporting discrimination and/or harassment. In addition, EmblemHealth maintained policies regarding reasonable job accommodations.

6.      EmblemHealth's policies were and continue to be published in a variety of places, including EmblemHealth's Standards of Conduct Handbook and within EmblemHealth's Corporate Policies.  EmblemHealth provided these materials to new hires and also periodically distributed updated policies to all employees.  The policies were and are also available to EmblemHealth employees on EmblemHealth's employee eNet Policy site on the Intranet. EmblemHealth provides regular training to its employees to prevent discrimination and harassment in the workplace and reiterate its complaint procedures.  Agostini regularly attended these trainings and was made well aware of EmblemHealth's policies and complaint procedures.

7.      EmblemHealth's Standards of Conduct Handbook contained policies concerning "Discrimination and Harassment," and reiterated the Company's policy "to maintain a work

2

environment that is free of harassment and that promotes mutual respect and cooperation among EmblemHealth employees." The "Discrimination and Harassment" policy stated that "[e]mployees are prohibited from harassing or discriminating against employee on the basis of race, color, creed/religion, sex, national origin . . . disability . . . or any other characteristic protected by applicable law." (A copy of relevant excerpts from EmblemHealth's Standards of Conduct Handbook is attached as Exhibit A).

8.      EmblemHealth's Standards of Conduct Handbook also contained comprehensive complaint procedures for employees to report any violation of an applicable rule, law, or policy to their supervisors, Human Resources, the Legal Department and/or the Compliance Department. Employees could also call an anonymous Compliance and Ethics Hotline, or submit an online report through the Compliance and Ethics Hotline website regarding such matters. (Ex. A). EmblemHealth's Standards of Conduct Handbook made clear that any employee reporting or using the Company's complaint procedures would not be retaliated against. (Ex. A). EmblemHealth's Standards of Conduct Handbook encouraged employees to report any problems or concerns to their managers, Human Resources, the Compliance Department, and/or the Legal Department. (Ex. A).

9.      Agostini was well aware of EmblemHealth's (and its predecessor's) Compliance and Ethics Hotline. Indeed, on or about October 12, 2007, Agostini used the Hotline to file a complaint about verbal conflicts with employees that she worked with at the time. Agostini chose to identify herself when she made this Hotline complaint, although she could have proceeded anonymously. (A copy of records from Agostini's October 12, 2007 Hotline complaint is attached as Exhibit B).

10.     During all relevant times, EmblemHealth also maintained a "Corporate Policy" as part of its Policies and Procedures. (A copy of relevant excerpts from the Corporate Policy is

attached as Exhibit C). This Corporate Policy reiterated EmblemHealth's commitment to be an "Equal Opportunity Employer," and reinforced its prohibition on discrimination of any kind in the workplace. This Corporate Policy encouraged employees who believed that they had been subjected to discrimination to report the discrimination to the Human Resources Department so that a thorough investigation could be conducted. Additionally, this Corporate Policy reiterated that there would "be no retaliatory measures taken against any employee who makes a complaint in good faith under this Policy." (Ex. C).

**The CBA Procedure Governing Layoffs and Bumping**

11.    Agostini commenced employment with predecessor company HIP on or about October 19, 1998. Throughout her employment at EmblemHealth, and previously with HIP, Agostini was a member of the Union and worked subject to the terms and conditions set forth in collective bargaining agreements entered into between EmblemHealth and the Union. Prior to their affiliation with EmblemHealth, HIP and GHI each maintained a clerical workforce and each negotiated a collective bargaining agreement with the Union covering the clerical employees. In November 2009, EmblemHealth merged the two clerical workforces into one and negotiated a single master collective bargaining agreement covering the merged bargaining unit. That agreement became effective on or about November 19, 2009. After HIP affiliated with GHI and EmblemHealth, Agostini became an employee of EmblemHealth (in 2008) and thereafter became covered by the master collective bargaining agreement (in November 2009). At the time Agostini's employment ended in September 2014, there was a collective bargaining agreement effective for the period between January 1, 2012 and December 31, 2014 (the "CBA"). (Copies of relevant CBA excerpts are attached hereto as Exhibit D).

12.    Article XX of the CBA contained a Non-Discrimination provision that prohibited discrimination against any employee by either the Union or the Company, and made clear that

4

"EmblemHealth's management does not tolerate any form of discrimination on any basis listed above [including disability], or any other discriminatory conduct on the part of any of its employees." The CBA also provided that "EmblemHealth's management wants and insists upon a workplace free from discrimination in every aspect and we will continue to take the strongest measures to achieve that objective." (Ex. D).

13.     Article XI of the CBA also contained procedures governing layoffs. Among other things, the CBA provided that certain employees could, in lieu of a layoff, "bump another employee in the same or a lower classification with less company-wide seniority provided such employee accepts such job within two (2) work days, and has satisfactorily performed in the past the duties of the new assignment, or has the qualification for and can satisfactorily perform such duties." (*See* Ex. D). In order for an employee to bump into another employee's position, the bumping employee must have been able to perform the job duties in the new role without receiving any new or additional training. The Company and the Union agreed that this process was critical to minimize any business disruption that might be caused by bumping.

14.     Article XIII of the CBA set forth a multi-step grievance procedure, which allowed the Union (or EmblemHealth) to file grievances arising out of any disagreements about the application or interpretation of the CBA, including grievances relating to layoffs and bumping. (Ex. D). Pursuant to the CBA's grievance procedure, if a grievance could not be resolved, either party could request binding arbitration, and if the dispute was not arbitrated, the grievance would be deemed "settled." Agostini was well-aware of the CBA's grievance procedure. Indeed, in January 2010, at her request, the Union filed a grievance on her behalf seeking to have a Final Warning for Unprofessional and Inappropriate Behavior removed from her file. (A copy of Agostini's grievance, dated January 21, 2010 is attached as Exhibit E).

15.     The January 2010 grievance was the only grievance that the Union ever filed on Agostini's behalf during her employment at EmblemHealth.

**The Different Functions Performed by Imaging Clerks**

16.     After HIP and GHI combined their clerical units under one master collective bargaining agreement in November 2009, Agostini was assigned to work in the Utilization Document Control ("UDC") Department, which was a sub-division within EmblemHealth's Claims Support Department. Her job title was "Imaging Clerk."

17.     Employees with the formal titles of Imaging Clerk or Junior Clerk generally performed one of three job functions: (1) Sorters (also referred to as tray mail), who opened mail and envelopes that arrived at the Company's facility and sorted it; (2) Scanners, who received specialized training to perform work on complicated and expensive Company-owned printer/scanners; or (3) Transfer Clerks, who moved large and heavy carts around the Company's facility to route mail and packages.

18.     As an Imaging Clerk, Agostini performed the Sorter function. As of mid-2014, Agostini had worked as an Imaging Clerk performing the Sorter function for approximately six years. At that time, only one other Imaging Clerk or Junior Clerk performing the Sorter function had less seniority than Agostini.

**The 2014 EmblemHealth Layoff And Resulting Bumping Decisions**

19.     In or about May 2014, due to a reduced work volume across various sectors of the Company, EmblemHealth began planning a substantial layoff in various departments to take place in September 2014 (the "Layoff"). Ultimately, pursuant to the Layoff, 45 positions were selected for termination. Agostini was **not** among the employees whose positions were selected for the layoff.

20.     In connection with the Layoff, on or about August 13, 2014, the Company provided the Union with a Layoff Notice which specifically identified positions being eliminated effective September 12, 2014 (hereinafter the "Layoff Notice"). (A copy of the August 13, 2014 Layoff Notice is attached hereto as Exhibit F). The Layoff Notice listed 45 positions that would be eliminated from nine different departments: Account Services; Corporate Services; Syracuse Customer Service; Member-HMO Enrollment; PPO Enrollment; Billing; Group Administration; Treasury and Government Programs. The Layoff did not eliminate any positions within the Claims Support Department, in which Agostini worked. (*See* Ex. F).

21.     In order to discuss the Layoff, including which employees would be laid off, and bumps that could occur as a result of the layoff, EmblemHealth provided the Union with a spreadsheet containing the seniority list setting forth the names, departments, job titles, labor grades, and years of seniority for all Union-member clerical employees (hereinafter referred to as the "Seniority List"). (A copy of the email and attached Seniority List are attached hereto as Exhibit G). The Union and EmblemHealth have followed this same procedure in the past when layoffs have been announced and laid off employees decide to exercise their contractual bumping rights.

22.     In addition, pursuant to the CBA, representatives of EmblemHealth's Labor Relations Department met with Union representatives to determine which employees would be laid off and/or bumped. In this regard, I attended several meetings along with Erica Kreiswirth and/or Diane McGuire, the Company's Lead Labor Relations Specialists at the time, and Union Chief Shop Steward Anthony Walters and/or Union Shop Steward Grace Adams-Cunningham to discuss these matters.

23.     Pursuant to the CBA, laid off employees can only bump into an existing position that would not require them to have any specialized skills or experience, or to need any

additional training (beyond basic orientation). In the past, whenever an employee has sought to exercise his or her contractual "bumping" rights, the Company and Union have examined the job functions of existing positions when determining which existing position the employee could bump into. Thus, in order to determine possible bumps for employees who would be impacted by the Layoff, the Union and Labor Relations identified positions at EmblemHealth that the employees to be laid off could bump into without requiring any specialized skills or additional training (other than basic orientation).

24.     For certain positions, including "Imaging Clerk" and "Junior Clerk", we did not just consider the formal job title of a position; rather, we considered the job functions actually performed by each employee working in that job title: Sorters; Scanners; or Transfer Clerks. The position (either Imaging Clerk or Junior Clerk in the UDC Department) that performed the Sorter function was prone to be bumped into by laid off employees because, unlike other job functions performed by Imaging Clerks and Junior Clerks, the Sorter function did not require any training or specialized skills.

25.     EmblemHealth and the Union determined that, in accordance with the seniority provisions of the CBA, qualified employees exercising their bumping rights would bump the least senior Imaging Clerks or Junior Clerks that performed the Sorter function. This required the Company to create a list of Sorters ranked by seniority. To do this, the Company had to determine which Imaging Clerks and Junior Clerks performed the Sorter function, as this information was not already reflected on the Seniority List. Accordingly, McGuire compiled a list of the Imaging Clerks and Junior Clerks in the UDC Department who were believed to perform the Sorter function, in descending order of seniority ("UDC Seniority List"). (A copy of an email from McGuire to Byrne, dated September 4, 2014 and the attached spreadsheet is attached hereto as Exhibit H).

26.    On September 4, 2014, I sent the UDC Seniority List to Weishaupt, and asked him to confirm that the UDC Seniority List captured all employees with the titles of Imaging Clerk or Junior Clerk who performed only the Sorter function.  In other words, we removed those employees from the UDC Seniority List who held the titles of Imaging Clerk or Junior Clerk but who performed other functions (such as Scanners, Transfer Clerks, and other functions relating to "Correspondence Expeditors" and "Grievance and Appeals") that generally required specific skills or training to perform.  (A copy of an email from Byrne to Weishaupt, dated September 4, 2014 is attached as Exhibit I).  In response, Weishaupt provided a list of employees in the UDC Department along with a corresponding description of their "Daily Functions." (A copy of Weishaupt's September 5, 2014 email to Byrne, with attachment, and my forwarding email to McGuire are attached hereto as Exhibit J).  This list identified 19 individuals as Sorters, including Agostini.  It should be noted that Weishaupt used the term "Tray Mail" to refer to Sorters.

27.    Of the 19 Sorters in the UDC Department, Agostini had the second to least amount of seniority.

28.    During the discussions with the Union concerning bumping, various proposals of possible bumps were considered.  (A copy of an email from McGuire to Walters and Adams-Cunningham, dated September 5, 2014 and attachment identifying some employees whose positions were going to be impacted by the layoff, as well as positions that those impacted employees could potentially bump into is attached hereto as Exhibit K).  In this regard, the Company provided to the Union certain job descriptions that would allow the Union to confirm that the employees bumping into a new position could perform all the tasks required in that new position.  (A copy of an email from McGuire to Walters and Adams-Cunningham, dated September 5, 2014, is attached as Exhibit L).

9

29.    As part of the bumping process, the Company attempted to determine whether any of the "bumped" employees could, themselves, bump into a new position.  Accordingly, Kreiswirth, McGuire, and I examined the job histories for each of the employees who, at that time, were at risk of being bumped.  (A copy of the September 9, 2014 email from Kreiswirth to McGuire and me is attached hereto as Exhibit M).  Agostini's job history showed that she had previously held the positions of Senior Mailroom Specialist, Mail Desk Clerk I, Secretary II, and Housekeeper.  All of these titles, with the exception of Housekeeper, were for jobs that were no longer active at EmblemHealth.  As such, and since we believed that Agostini did not have the skills or qualifications to step into any other position without training, we determined that if Agostini was bumped out of her Imaging Clerk role, she could potentially bump into a Housekeeping position.  No viable bump was identified for ███.

**Three Sorters, Including Agostini, Are Bumped Out of Their Sorter Positions**

30.    After multiple discussions, various bumpings were ultimately proposed and agreed to by EmblemHealth and the Union. One of these bumpings impacted Agostini, who was working at the time as a Sorter in the UDC Department.  In the end, three Sorters with the least seniority were initially bumped: Agostini (the second least senior Sorter in the UDC Department with 15.34 years of seniority), ███████ (the least senior Sorter in the UDC Department with 7.18 years of seniority), and ███████ (the third-least Sorter who had 18.98 years of service).  (A copy of emails from Kreiswirth to Byrne listing the seniority of the Sorters are attached as Exhibit N).  They were bumped by ███████ (an Intake Specialist, Sr. with 22.9 years of seniority), ███████ (an Intake Specialist, Sr. with 22.9 years of seniority), and ███████ (an Administrative Clerk with 22.87 years of seniority).  (Copies of emails concerning the bumps are attached hereto as Exhibit O).

10

31.    Days after starting into his new Sorter position, ██████ changed his mind, and decided to accept severance instead of remaining in the Sorter position that he had bumped into. When this occurred, ████████████ was recalled from Housekeeping, where she had bumped, and was able to stay in a Sorter position because she had the most seniority of the three bumped Sorters in the UDC Department, pursuant to the CBA.  (A copy of the letter to ██████████, dated September 12, 2014 is attached as Exhibit P).  If the Company had recalled Agostini or ████ after ████████ changed his mind and elected to take the layoff, the Company would have violated the CBA.

32.    Throughout the process of identifying possible bumps, discussing them with employees and processing such bumps, the Union, as the employee's representative, was consulted and actively participated.  At no point did the Union raise any objection or file any grievance relating to any of the Company's decisions regarding the Layoff or the related bumping process.

**Agostini Was Offered a Bump Into Housekeeping**

33.    On September 11, 2014, I attended a meeting with Agostini, McGuire and Kreiswirth.  Walters and Adams-Cunningham were also present to represent Agostini.  At this meeting, I informed Agostini that she had been bumped out of her position by another, more senior employee pursuant to the terms of the CBA, and we discussed how the contractual bumping process worked.  I explained to Agostini that she had the ability to bump into a Housekeeping position, and that because she had previously worked as a Housekeeper, we believed she could step into that position without training.  I told Agostini that under the terms of the CBA, she had two business days to decide whether she wanted to exercise her right to bump into this Housekeeping position.  Agostini was impatient and, after I told her how long she had to accept the bump, she abruptly left the meeting and did not return.

11

34.     During the September 11, 2014 meeting, I never told Agostini that the Housekeeping position was not available to her because of any medical condition.  No one else present at the meeting made any similar comments or statements to Agostini.  To the contrary, I (and others present at the meeting) clearly told Agostini that the Housekeeping position was a viable bump and she could elect to accept it.

35.     Agostini never contacted EmblemHealth to exercise her right to bump into the Housekeeping position.  Accordingly, Agostini was laid off along with 45 other employees.  (A copy of the letter to Agostini regarding the bump is attached as Exhibit Q).  Pursuant to the CBA, as she was bumped and did not bump into another position, the Company paid Agostini severance equal to 26 weeks of pay, plus other amounts for a total payment of $29,242.91. (*See* Ex. Q).

36.     At the time that Agostini was bumped out of her Imaging Clerk position in September 2014, I had no knowledge that an anonymous Hotline complaint referencing Agostini had been made on August 1, 2014.  I also had no involvement or knowledge regarding the investigation into the Hotline complaint, or the outcome of the investigation.  At no point did the Company consider Agostini's purported disabilities when it determined (along with the Union) that she would be bumped out of the Imaging Clerk position.   The Company also never considered the fact that Agostini had requested (and been granted) leave under the Family Medical Leave Act ("FMLA") as part of its decision-making process.  Notably, at that time, Agostini's requests for FMLA leave were handled by a third-party administrator.  Overall, as described above, Agostini was selected to be bumped out of her Imaging Clerk position because she was the second least senior employee performing Sorter functions.

37.     At no point after Agostini was bumped out of her position did the Union file a grievance or any other claims on Agostini's behalf.  As described above, the Union had worked

closely with the Company throughout the bumping decision-making process, and it had indicated

that it was in full agreement with respect to all decisions that the Company made, including the

decision to bump Agostini.  Indeed, when Agostini raised concerns after her bumping that it was

not done properly, it is my understanding that the Union reiterated to Agostini, after the

bumping, that it had been conducted pursuant to and in compliance with the CBA.

**Agostini Was Repeatedly Accommodated
and Provided FMLA Leave by EmblemHealth**

38.     During Agostini's employment, EmblemHealth maintained a Reasonable

Accommodation policy.  (A copy of the Reasonable Accommodation policy is attached as

Exhibit R). This policy reiterated the Company's commitment to provide "Reasonable

Accommodations(s) to qualified applicants or employees with Disabilities to enable them to

participate fully in all aspects of employment . . . and all other terms, conditions and privileges of

employment." and encouraged employees who "believe[d] he/she ha[d] been subject to unlawful

discrimination regarding a disabling condition or ha[ve] an accommodation that is not being

reasonably accommodated [to] immediately report these events to the Human Resources

Department," it assured employees that "[a]n investigation of all complaints will be undertaken

immediately," and that "[r]etaliatory action against an employee for asserting his/her rights under

this policy or laws prohibiting discrimination will not be tolerated."

39.     During Agostini's employment, EmblemHealth also maintained an FMLA policy

which affirmed compliance with the law, set forth the procedures for individuals seeking FMLA

leave and reiterated that the Company prohibits retaliation against employees seeking or taking

FMLA leave.

40.     Throughout the relevant period Agostini was employed by EmblemHealth, the

Company used a third party administrator (first the Hartford and then MetLife) to handle its

FMLA leave.  Accordingly, employees seeking FMLA leave were required to submit their

requests for FMLA, and any supporting medical documentation, directly to the third party administrator. To the extent that employees were approved for intermittent leave, they would advise the third party administrator of when they were using such time so that it could be tracked and recorded. The third party administrator would in turn inform EmblemHealth of its approval or disapproval of requests so that EmblemHealth would be aware of it, for attendance purposes.

41.    Agostini was repeatedly provided accommodations for her purported medical conditions throughout her employment at EmblemHealth, and its predecessor HIP. Throughout her employment with EmblemHealth, in addition to other medical leave she may have taken, Agostini was consistently granted requested FMLA leave, through the Company's third-party administrators, Hartford and MetLife.

42.    In 2007, Agostini requested and was provided time off to attend physical therapy for back pain. On April 24, 2007, Agostini requested further accommodations for back pain, including back support and lifting restrictions, which were also granted. After Agostini later alleged that the wires had been cut on the back support pillow, the pillow was replaced with a battery operated back pillow, so that Agostini would not trip on the wires. (A copy of correspondence confirming the accommodations is attached as Exhibit S). In October 2007, in response to her request for an accommodation, Agostini was provided with a motorized back pillow. (A copy of correspondence confirming the accommodation is attached as Exhibit T).

43.    In 2011, Agostini took FMLA leave from November 14, 2011 through March 1, 2012. (Copies of FMLA documentation for the leave are attached as Exhibit U). In February 2012, Agostini was also granted an accommodation which would allow her to work a part-time schedule for one month. (A copy of correspondence confirming the accommodation is attached as Exhibit V). I allowed her to extend this part-time schedule to April 30, 2012, and worked

14

with her to obtain the necessary information so that she could continue to receive a part-time schedule as an accommodation for as long as she required it.

44.     In 2013, Agostini took intermittent FMLA leave in May, June, July (Copies of pertinent FMLA documentation are attached as Exhibit W). She was thereafter provided continuous FMLA leave from September 6, 2013 through October 17, 2013. (Ex. W). When Agostini returned to work, she had a restriction to not lift over 20 pounds for three months. (A copy of correspondence regarding the requested accommodation is attached as Exhibit X). Once notified of the request, Weishaupt confirmed that his team would "make the necessary accommodations for 3 months to provide the employee with her daily work without the need for her to lift the mail trays." (*See* Ex. X). Her managers at the time, Maria Vera, Jane Charles, Neco Belin, and Hedy Figueroa, were notified of the accommodation.

45.     In January 2014 Agostini applied for FMLA leave to begin as of January 23, 2014. (A copy of letters from MetLife to Agostini, dated January 28, 2014 and February 21, 2014 are attached as Exhibit Y) All documents with respect this FMLA leave would have been submitted directly to MetLife. In February 2014, Agostini sought additional FMLA leave to begin as of February 14, 2014. (*See* Ex. Y). Pursuant to these FMLA leaves, Agostini intermittently took FMLA leave beginning in February 2014 and periodically thereafter. At no time did Agostini complain to me, or to my knowledge anyone else, that anyone tried to interfere with her ability to use these FMLA leaves or retaliated against her for doing so.

46.     In August 2014, in response to Agostini's request for an accommodation relating to standing at the photocopier, all managers in the UDC department were informed that she was not to make photocopies anymore and steps were underway to order a chair for the copier.

47.     In considering possible bumps, EmblemHealth did not take into consideration Agostini's medical condition, or that she had taken FMLA leave during the course of her

15

employment.   Indeed, it should be noted that the two other Sorters who were also bumped

(███████████ and ███████████████) had not taken FMLA leave in the two years

preceding their bumps and had no known medical conditions at the time of their bumpings.

48.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 9, 2018.

_____
                                Daniel Byrne